Good morning, Your Honors, and may it please the Court. My name is Sophia Velling with the Northwest Immigrant Rights Project. On behalf of the petitioner, Mr. Ajitay Khorshi, I would like to reserve three minutes of my time for rebuttal. As this Court recently articulated in Alambi v. Garland, adverse credibility determinations will always require assessing the totality of the circumstances. In this case, Mr. Khorshi fears returning to Ghana, a country that criminalizes homosexuality. The agency erred in finding Mr. Khorshi not credible and based the determination on three perceived inconsistencies. As part of his decision, the immigration judge also raised concern over the crux of Mr. Khorshi's claim, his sexuality. What is your client's native language? It's Ewe. But he speaks and understands English? He does, but he's not fluent in English. And he appeared before an asylum officer and then later at a probable cause determination and then lastly before an I.J.? Correct. And the I.J. determined that he lacked credibility because, among other things, he had lied under oath at one of these hearings, is that correct? He said he didn't have children when he did have children. He did. He did. However, when Mr. Khorshi spoke about his children and when he tried to explain why he had said that he did not have children, the immigration judge failed to provide a specific and cogent reason for denying Mr. Khorshi's explanation. His explanation was that somebody in jail told him to lie about that. Is that right? It was. And Mr. Khorshi also explained... Does that require an examination by an immigration judge? Mr. Khorshi also... The petitioner says, it was not true, I lied, the reason I did it is not because somebody put a gun at my head, but because one of my fellow inmates told me this is, I shouldn't admit that I had children, right? Given the totality of the circumstances here, Mr. Khorshi feared for his life returning to Ghana because of his sexual orientation, and he feared that if he explained... The problem that we're having, I have the same concern, is he swore under oath to tell the truth before a different administrative law judge, and he testified that he had no children. Then before a different administrative law judge, again after having sworn to tell the truth, he admitted that he did. Both cannot be true, and it's difficult to justify basically perjury by simply saying somebody told me to lie. And we would have to declare that that is not substantial evidence in order to... We'd have to conclude that no reasonable adjudicator could conclude that he was not being truthful based on that lie. That's a tough standard to meet on these facts. It is, and even if that is the case, Alambi Garland did away with the single factor rule. So even if it were the case that there is no substantial evidence here, despite Mr. Khorshi's reasonable explanation and despite the immigration judge's failure to give reason and specific and cogent reasons, there is no amount of credibility findings. There's no bright line rule as to how many should support or reject an adverse credibility finding. But again, you're up against the substantial evidence rule, and the question is whether or not an outright lie, perjury, is sufficient to support an adverse credibility finding. And I'd be hard-pressed to say that it is not under the substantial evidence standard. Taking into consideration the totality of the circumstances, though, and the other two factors on which the agency relied upon Mr. Khorshi's adverse credibility determination, those two factors as well, the immigration judge also failed to provide specific and cogent reasoning for denying Mr. Khorshi's explanations for why there was a purported inconsistency... Other justifications? Because, I mean, he did provide a reason why he found him not credible because of this lie, and the best he could offer was another inmate told me that it would be to my advantage to deny that I had children. Well, he also explained that because of his sexual orientation, in Ghana, in order to the look that he was not a member of the LGBTQ community, and he didn't know when he came here that any reasonable person here in the United States would know that somebody who is a member of the LGBTQ community could also have children. And so he feared, reasonably, that if he told U.S. immigration officials that he had children, that they would think that he was lying about his sexuality. Did the board find that sexuality was a factor in the adverse credibility determination? I know the IJ talked about it, but I didn't see much discussion of that in the board's ruling. Yeah, both the board and the respondent have declined to defend the immigration judges. But I guess the question I'm really asking is, don't we review the determination by the Board of Immigration Appeals? That's the decision. And if they didn't rely on the sexuality claim, then do we even have jurisdiction to review it? Maybe jurisdiction isn't the right word, but since they didn't rely on it, how is it relevant? I would argue that they did rely on it. And it's evidenced. They didn't talk about it? Yes, it's evidenced in the CAT determination, because they simply denied CAT on the adverse credibility alone. And in Mr. Corsi's case, it's similar to the case in Udo v. Garland, where this court found that the agency erred in denying protection under the Convention Against Torture to the petitioner, where he was found not credible with respect to his sexual orientation, despite potentially dispositive evidence in the record to the contrary. Here too, Mr. Corsi— I thought there was an extended discussion with regard to his interaction with the military, where he was whipped, but he didn't mention that until the middle of the merits hearing. That was the first time it came to light. I would disagree with that, Your Honor, because Mr. Corsi actually wrote about it in his asylum application. He specifically wrote that military officers in Ghana tried to kill him. Well, I agree with that, but that's pretty vague in terms—and I'm mindful of the comment that the immigration judge made when he asked the lawyer who was representing Mr. Corsi at the merits hearing, have you ever heard this before? And the lawyer candidly admitted he had not. So it's hard to say that that's what Mr. Corsi was referring to in his asylum application based on that record evidence. Well, what the immigration asked of the counsel was, has Mr. Corsi ever written this out? And the truth is that Mr. Corsi did not provide a declaration. He did not write out the details of what had happened to him with the military. But he did— You don't dispute the fact that the details with regard to the actual abuse that he suffered didn't come to light until the middle of the hearing? Yes, but— Your argument is that it's just an explanation or a more fuller explanation of the abuse that he suffered at the hands of the military? Correct. And this court has consistently held that testimony is not per se lacking in credibility simply because the details elicited in testimony are not set forth in the asylum application. And this is like the case in Smolniakova v. Gonzalez where the petitioner spoke about her wrists being slashed during the merits hearing, but didn't specifically include that in her asylum application. However, this court found that that was simply an elaboration on what she had written in her asylum application. And I argue that that is the case here as well, that Mr. Corsi simply elaborated on what he had explained in his asylum application. And is it your position that the asylum application that led to the second hearing was a new asylum application or just an extension of the first? It was an asylum application that Mr. Corsi prepared with the help of counsel once he was represented. But you would argue it's a separate application? I would argue that it is an updated asylum application. And the immigration— Updated meaning that— Updated meaning Mr. Corsi had had the opportunity to meet with counsel and help— Like an amended complaint. Like an amended complaint in a civil proceeding. Add a little bit to it. I don't know that I can compare those. I have a question, and I'm asking for something that is in the record. If it is not in the record, just tell me so. Okay. In this explanation that he gave, the more detailed explanation, he said that he was whipped more than 20 times, leaving permanent scars on his back. Did he show the eye judge his back? He tried. Well, he told the— He asked to do that? He asked to show his scars. And? This was on cross-examination, and the trial attorney there said, no, we don't need to see the scars. And the immigration judge did not step in and say, you know, I would actually like to see the scars. So Mr. Corsi offered in front of the court, and no one took him up on it. You've answered my question. Yeah. Okay. Okay. I'd like to turn back to the CAD determination, if that's all right. Sure. Okay. So potentially dispositive evidence in the record does support that Mr. Corsi is a member of the LGBTQ community. The immigration judge, his only reason for doubting this was because Mr. Corsi did not explicitly state it during his border interview. And this court, again, has held that we're an unrepresented and newly arrived individual, does not fully provide all the details of their claim for fear, but does provide a vague outline of the asylum claim. It doesn't necessarily mean— If we uphold the adverse credibility determination, what additional evidence does he have to support the claim for a cap relief? Well, Mr. Corsi would have the opportunity to show the scars and provide a medical report indicating— No, I'm not asking what he would do if we sent it back. I'm asking what we have in the record if we determine that the adverse credibility determination stands. What other evidence would you point to to show, for example, acquiescence by the authorities? So it is a crime in Ghana to engage in same-sex male sexual acts, and that can be found on the record on page 301. Additionally, LGBTQ individuals in Ghana are harassed and intimidated by the police, and police are known to beat and abuse detainees and citizens. So the government is very much involved in the acquiescence and even in the torturing of individuals who identify as LGBTQ. Would you like to save the remainder of your time? I would like to save the remainder of my time. Thank you very much for your argument. Thank you. Before we step down, Judge Ikuda, do you have any questions of Petitioner's Council? Okay. And she says no. Thank you. We'll hear from the government at this time. Is this—is it Ishanula? Ishanula. Ishanula. There is a button there that Stacy can help you with that, if you press it, will lower the podium. I got it. Thank you. You found it? Yeah. Going the wrong way. There you go. Right where you feel comfortable. Are you good? I think so. Okay. Thank you. May it please the Court, my name is Neelam Ishanula, and I represent the U.S. Attorney General in this matter. The Court should uphold the agency's adverse credibility determination, which bars Petitioner from both asylum and withholding of removal, because the three grounds of the adverse credibility finding identified by the Board and upheld by the Board are supported by substantial evidence. The Court should also affirm the agency's denial of CAT protection, protection under the Convention Against Torture, because Petitioner has failed to bring forward sufficient evidence independent of his non-credible testimony to meet his burden for CAT. Was the country report from Ghana put in evidence? The Petitioner put many country reports for Ghana into the record, yes. And what did they say about the treatment of the gay community in Ghana? They did evidence, you know, widespread mistreatment, but the IJ's merits findings were not addressed by the Board. So, respectfully, the alternative merits holding is not an issue here. It's just, you know, when it came to CAT, the Board and the IJ, that Board said that the adverse credibility determination is dispositive because there is not independent evidence independent of his non-credible testimony that is sufficient to meet his burden of proof. But his basic contention that he was badly treated in his native country, Ghana, and would be badly treated, indeed, his claim tortured if he returned to Ghana, was in part, at least, confirmed by the country reports, right? Well, but he had— It's not like this is a country report from a country that has—that it's perfectly permissible, legal, and accepted to be part of the gay community. The country reports confirm that. The opposite. But respectfully, Your Honor, this case, the asylum and the CAT claims are identical. So when the immigration judge and the Board affirmed the adverse credibility determination for asylum, because the same statements that he—were found to be not—the same testimony which was found to be not credible for asylum, that adverse credibility finding carries over to CAT. And so, you know, this is, you know, an outcome of this statute, the burden of proof being on the petitioner. Once the testimony is found to be not credible, you have to look at the independent evidence and see if that alone can meet the burden of proof. This is discussed in Almanzar and in Shrestha. We look at the country conditions or other independent evidence alone. Once a credibility finding is made, that disposes— But I think what we're pressing you on is, even if he was not believable, there still is some additional evidence in the record by way of the country conditions report that talks about how the Ghana government and society there treats LGBTQ persons. Is that correct? There's a great deal of evidence, but it's not particularized to Mr. Karshi. And it's insufficient to overcome that adverse credibility finding. You know, under the REAL ID Act, an adverse credibility finding does not have to go to the heart of the claim. And so it could rest entirely on minor inconsistencies. And so when you have enough inconsistencies that you reach the level of being not credible, it shifts over to an analysis based purely on the independent evidence. And that's the situation for Mr. Karshi. Are you saying that's a country condition? We have our adverse credibility jurisprudence— Question from Judge Okuda. Can you hear me all right? I can. Yes, Your Honor. Our adverse credibility jurisprudence allows us to say if you're false in one thing, you're false in everything. But based on what the BIA said, I didn't see the BIA disbelieving that he was gay. Are you arguing that he is not—that the average credibility determination would also cover his statement that he was gay? My—when I'm arguing is that the BIA and the IJ, neither of them made an explicit finding that his testimony about being gay was credible. Once he was found to be non-credible in general, an analysis that looks at the totality of the circumstances of his testimony, you know, that his testimony was insufficient then to meet the burden of proof. And so— Let me ask you this. If we disagree and say there was evidence that the BIA didn't rule that it disbelieved his statement that he was gay, and we look at the country conditions report in the record that talks about the treatment of gay people in Ghana, is there enough to carry his burden of showing it's more likely than not he would be tortured in Ghana? I'm sorry. That's assuming that the board said what exactly? I'm sorry. I didn't catch that. Did not accepted that he was gay. If we accept that the board did not accept that he was gay. The board didn't rule on that issue, so let's assume that he is gay for this—for these purposes. Well, so that's, you know, that's the fundamental disagreement I think the parties have. Just because the agency does not opine on a certain part of your claim, that doesn't mean you're being deemed credible on it. You know, that's what I'm trying to get at when I talk about the REAL-ID Act, allowing for credibility findings based solely on minor inconsistencies. That doesn't mean that the heart of your claim is therefore credible, because, you know, the determination could be based solely on minor inconsistencies. The only way that Mr. Karshis could be deemed gay for the portion—for the cat portion is if the board had somehow said, we do find him—they make an explicit credibility finding saying that we believe him gay for—but that wasn't—that's not what happened here. And then if we look at the independent evidence, it's simply insufficient to meet his burden of proof. Petitioner has identified it in their brief. There's two statements, one from a sister, one from an uncle. They're very short and conclusory. They don't evidence personal first-hand knowledge. They don't corroborate several incidents of harm that he lays out—that he lays out as happening to him in Ghana, so they don't, you know, provide support for his claim. And they're very different from the statements that are in Udo, where there was—the court describes those statements as—as just, you know, having a great amount of detail of fiance there had personally witnessed the harm to the petitioner and had also suffered harm themselves because of their relative sexual orientation. There was also a document from the village elders where Mr. Udo was being labeled as and was—the village elders were condemning him for that fact. Basically a death warrant, isn't it? It's very significant evidence in Udo. And, you know, it's just very different from what we have here. We don't have that kind of independent evidence, and that's why the board found that the adverse credibility finding does dispose of Mr. Karsi's cat claim. One of the inconsistencies that both the IJ and the board pointed to was the fact that he first said he had no children and then admitted that he did have children. That is one of the grounds for finding inconsistency, right? Yes. How is having children or not having children inconsistent with a claim that you're being—you would be subject to torture if you returned to a country that is fundamentally anti-gay? I don't quite understand the question. I'm sorry, Your Honor. Do you mind—do you mind asking again? I might have a better understanding of the second time around. Let's—just hypothetically, let's say that at one point in the proceedings, he said he had never received a traffic citation. And later in the proceedings, even under oath, he admitted that he got two speeding tickets. Okay. Would that be something that either the IJ or the board could rely upon as evidence of lack of credibility? Do you mean why should it matter? Because it's— Exactly. Yeah. I mean, the reason why it matters is it's because he was put under oath at the beginning of that hearing and— My hypothetical assumes that. Okay. Well— During the asylum interview in my hypothetical, the petitioner says, I've never received a traffic ticket in my life. And then at the IJ hearing, under oath, he says, well, in fact, I got three speeding tickets when I lived in Accra. Okay. The fact that he is making a deliberately false statement, that is particularly compelling evidence of non-credibility. You know, even the—I think this court has said in Kumar, post-alum and the end of the single factor rule, that falsehoods and fabrications weigh particularly heavily in the adverse credibility inquiry. So just the fact that he would, you know, under penalty of perjury, you know, make a false statement to the immigration judge is quite telling of his credibility and worrisome overall. I would have thought your argument might be there's a difference between forgetting about traffic tickets and forgetting about whether you have children. It is quite different. One does not forget you have children. You're right, Your Honor. I also— I thought the point was that—and maybe this is what the inmate was trying to tell him— if you admit that you have children, then it's less likely they're going to believe that you're gay. Isn't that the point? That is the point. And—but it's, you know, it is an explanation— By denying that he had children, it actually enhanced his claim when he made the false statement. It certainly did. It's not a first-day LJ. That's right, Your Honor. He was—he was making a false statement that really benefited him at the time. And that does go to the heart of his claim as opposed to the traffic ticket hypothetical. Definitely more than the traffic tickets. One thing— Judge Acuda, do you have any other questions? Are we— How about you? No. Am I over? You're not over your time. And if you want to spend four minutes trying to embellish your argument, you're welcome to it. We guarantee you that time at the outset. I rarely come to the Ninth Circuit, so you might humor me for a little bit. Sure. That was a hint, but you don't have to take it. I know, but I'm sorry. I just wanted to point out a few things. You know, the record evidence does say that, you know, Mr. Karshi on multiple occasions indicated he was fluent in English. He says so in both the asylum applications and at every immigration court hearing, he's asked if he was fluent in English except for the last one, and he said that he was. Mr. Karshi has now put forward in the briefing a cultural explanation for not having told about his children. He's saying, you know, in Ghana, it would have been questioned more, and so I didn't want to tell the immigration judge based on my experiences with Ghana. That cultural explanation was not made— that explanation was not proffered at the agency level. It's only been raised here at the briefing, and so I would argue that it's unexhausted. And the scar issue, I would say I'm surprised that there was not medical evidence put into the record documenting those scars. That would have been, I think, the proper way to do it. You're saying that even if he had scars on his back, we don't know who was responsible for that if we don't believe his story? There are scars, but, you know, the way he tried to present it was improper. It was raised on cross-examination. He wanted to show the scars to DHS, and DHS— he didn't actually ask the immigration judge. He asked the DHS trial attorney, and you're right, though. I mean, we don't know the circumstances of those scars. We certainly don't have any medical— It could have been inflicted by villagers. It could have been inflicted by family members. We don't know, and he's using it as proof of the nexus that, you know, it was done— Didn't he testify to an earlier arrest at which he claimed that a police officer gave a whip to other inmates and encouraged them to beat him? He did. He said that the police did not injure me in detention, but they directed the detainees to hurt me, and that's why I also think that, you know, the omission about the military whipping is also significant, because his testimony right before had just sort of undermined a government actor claim because he said that the police had not injured him directly, and so when he talks about the military whipping, he is very much bolstering his claim because he is, you know, elaborating on the harm. It's a greater form of persecution, and also it helps him meet the government actor requirement for asylum and withholding of removal. And also, you know, the counsel who wrote the asylum application and put in that reference about military officers in Ghana having tried to kill me, she herself never used that statement to say that Mr. Karshi's testimony could be reconciled with the asylum application. I think that's very telling. She wrote that asylum application, and she never tried to say this reference— this was a reference to the military whipping. She— The same lawyer who represented him at the hearing? At the merits hearing? Yes. Okay, so when the judge asked her, have you ever heard this before, and she said no, then if she wrote the application, she couldn't have had that in mind at the time she wrote the application? And she also asks, on redirect, she asks her client, was this, you know, what is she says, why did you not share that story before now? So she's asking him, you know, why didn't you share this story, suggesting she had not known about herself? And if we look at her pre-hearing brief that was submitted to the immigration court, she doesn't actually talk about the military whippings, even though she does discuss much harm that Mr. Karshi experienced. And we would expect that, again, she having drafted the application and that statement about military officers, she would know what she was trying to get at, and she never uses it to encompass the military episode. And now you are out of time. Thank you for your argument. Thank you. We'll hear a rebuttal argument at this time. I'd like to point out here that an adverse credibility finding does not necessarily defeat a CAT claim. The respondents' briefing and the BIA's decision inherently assume that Mr. Karshi is not a sexual minority because they have factored into the totality of the circumstances in their CAT decision. I still wonder though, aren't we beyond the scope of review here? Because the board didn't cite to this factor. The IJ certainly talked about it, but the board did not. Well, Mr. Karshi, he presented a lot of plausible evidence supporting his— Before the IJ. Before the IJ, right. He spoke about his sexual orientation during his credible fear interview. He wrote about it in his asylum application. I don't dispute any of that. But the question is, what is the scope of our review? And I thought the scope of our review is limited to the reasons that the board gave for upholding the denial of benefits. And they didn't cite to this issue about whether or not he truly is gay. The board didn't cite to it, but it's inherent in their decision to deny CAT based on the adverse credibility determination. Well, if you don't believe his testimony, we're back to the question I asked you before. What else is there? And I heard government counsel say, okay, we have the country conditions report, but there's no nexus or particularized link between the country conditions and this particular applicant. You don't have to have particularized evidence in order to support a CAT claim. I think you do, based on the precedent in the Ninth Circuit that I'm thinking of. You've got to show something more than, for example, in El Salvador, that there are bad conditions involving street gangs. You have to show some kind of a link to this applicant, if he's returned to the country, that he's likely to become the victim of violence at the hands of the gangs. Right. And in this case, it's a crime to be gay in Ghana. And the particularized- It's a crime to engage in extortion and the other things that the Mexican cartels are doing. But we return people to Mexico all the time because they can't show a particularized risk of harm to them, even though the general country conditions are pretty bad. Well, Mr. Corsi is a member of the LGBTQ community, and it is clear within the country reports. If we believe his testimony. If you believe his testimony. It's kind of a circular argument. But with regard to his sexual orientation, both the BIA and the respondent have declined to defend that argument because there is such persuasive evidence in the record that he is, in fact, a member of the LGBTQ community. You are over your time. Okay. Thank you very much. Thank you very much. Thank both counsel for your arguments and briefing. That case, Corsi versus Garland, will be submitted.
judges: HAWKINS, TALLMAN, IKUTA